[Cite as *Cleveland v. Alexander*, 2014-Ohio-5282.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 101068

---

**CITY OF CLEVELAND**

PLAINTIFF-APPELLEE

vs.

**MARKEITH ALEXANDER**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cleveland Municipal Court
Case No. 2013 CRB 028333

**BEFORE:** Kilbane, P.J., E.T. Gallagher, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** November 26, 2014

**ATTORNEY FOR APPELLANT**

Jeffrey F. Slavin
1370 Ontario Street
Suite 1810
Cleveland, Ohio 44113

**ATTORNEYS FOR APPELLEE**

Barbara Langhenry
Director of Law
City of Cleveland
Victor R. Perez
Chief Prosecutor
1200 Ontario Street
Justice Center - 8th Floor
Cleveland, Ohio 44113

MARY EILEEN KILBANE, P.J.:

{¶1} Defendant-appellant, Markeith Alexander ("defendant"), appeals from his convictions for domestic violence and child endangerment. Having reviewed the record and the controlling case law, we affirm.

{¶2} On September 8, 2013, defendant had a visitation-related dispute with the mother of his child. On September 11, 2013, he was charged in the Cleveland Municipal Court with two counts of domestic violence: one count pertaining to his child's mother, Sanita Tayor ("Sanita"), and one pertaining to his child. Defendant was also charged with one count of child endangering. He pled not guilty, and the matter proceeded to a jury trial on January 15, 2014.

{¶3} The city presented testimony from Sanita, Cleveland Police Officer Nick Sabo ("Officer Sabo"), Cleveland Police Detective Roderick Stoudmire ("Detective Stoudmire"), and Sanita's mother ("grandmother").

{¶4} Sanita testified that she and the defendant broke up about three years ago, immediately before the birth of their child. She and defendant are subject to a visitation plan established by the juvenile court. Under this plan, the defendant is entitled to see his child twice a week and every other weekend. Sanita maintained that the defendant does not consistently abide by the plan, at times foregoing visitation and at other times keeping the child for extended periods. She also stated that the defendant is "always disrespectful, always yelling, threatening, screaming, hollering," so she avoids contact with him, and the grandmother acts as an intermediary.

{¶5} With regard to the events of Sunday, September 8, 2013, Sanita stated that the defendant sent her a text message at 4:30 p.m. about picking up the child at the home Sanita

shares with the grandmother. Because the defendant had the child for the entire previous weekend, Sanita told him that he could not see the child on that day because she was to be with her that weekend.

{¶6} Later in the day, at around 6:00 p.m., the defendant contacted Sanita again. She again refused to let him see the child, explaining that it was too late and that the child had to go to bed. Sanita received a text from the defendant that stated "I'm taking her anyway." She then heard a commotion in her yard and saw that the defendant, his former girlfriend, Latorian Young ("Young"), and a few of his family members had arrived in two separate cars to pick up the child. Sanita ran outside, saw the defendant holding her, and told the defendant that he could not take her. She reached for the child, but the defendant pushed her away. The child then began to cry. Sanita continued to reach for her, but the defendant repeatedly pushed Sanita away.

{¶7} Sanita testified that she pulled the child from the defendant's arms, and the defendant then pushed her, causing her to lose her balance. Sanita stated that she and the child nearly fell off of the porch. Sanita's aunt then ran outside and grabbed the child, and the grandmother jumped in between Sanita and the defendant. Sanita stated that she was not injured, but the child fell against the railing and sustained a large scratch to her back. Photos taken the day after the incident were presented to the jury. Sanita maintained that the defendant and his group threatened her and her family, so she called the police. The police arrived immediately, and the next day Sanita made a written statement.

{¶8} The grandmother testified that she received a telephone call from the defendant at 3:20 p.m. He said he was stopping over to pick up the child. She said that was okay and asked if he had checked with Sanita. The defendant indicated that he had checked with Sanita and that she agreed. Grandmother then began to call Sanita's cell phone. Sanita was upstairs watching

T.V. at time, and she did not answer. The defendant arrived and asked why the child was not dressed and ready to go. The grandmother then sent her son upstairs to get Sanita. The grandmother stated that by this time the defendant had stepped out on the porch. She then heard her sister scream, so she ran out to the porch and saw Sanita, who was holding the child, start to go over the porch railing. She observed her sister trying to hold them up and the defendant leaning over them. According to the grandmother, the defendant had his fist drawn back, so she intervened and warned the defendant that if he hurt Sanita, she would press charges. He cursed at Sanita and stated that he could take the child.

{¶9} Officer Sabo testified that when he arrived at the grandmother's home, the defendant was agitated and complained that Sanita did not let him take the child to a birthday party. The defendant further stated that Sanita had slapped him, which caused him to call the police. Officer Sabo then spoke with Sanita, who was also agitated and upset, and she told him that the defendant had grabbed her arm, and that she almost fell off of the porch while she was holding the child.

{¶10} Detective Stoudmire testified that he met with Sanita and the child next day, September 9, 2013, and observed a four-inch long scratch across the child's lower back. According to Sanita, the injury occurred when the defendant pushed her as she was holding the child, causing the child to fall against the porch railing.

{¶11} The defendant testified on his own behalf and also presented testimony from his twin sister and Young. Young testified that the defendant is the father of her son, T.A., and that they wanted the child to attend a surprise party, so they drove to the grandmother's home to pick her up. According to Young, the defendant waited for the child on the grandmother's porch. When the child came out, he held her as he spoke with the grandmother. Sanita then suddenly

ran out of the house and began swinging at the defendant. Another one of Sanita's family members grabbed the child from the defendant's arms and placed her inside the house. The defendant returned to the car and called the police. He then waited for them to arrive. The police arrived within five minutes and the defendant explained what had happened. According to Young, the defendant did not strike or push Sanita, and he did not cause the child to be hurt. She acknowledged on cross-examination, however, that the defendant does have a temper at times.

{¶12} The defendant stated that he has worked at Nestle USA for two years. He stated that he ended his relationship with Sanita just before the child was born because she slapped him in front of her mother at the baby shower. The next day, he packed all of his things and left. After the child was born, Sanita kept her from him for two years. He continued to pay child support and went to juvenile court in order to obtain a visitation order because he wanted to be in the child's life. Even though he now has court-ordered visitation, Sanita still keeps the child from him. He stated that he believes that Sanita is upset with him because he is no longer in a relationship with her.

{¶13} With regard to the events of September 8, 2013, he stated that he called to ask if he could take the child to the birthday party. Sanita said that they were on the road. He drove there and saw the child inside the doorway. At that point, the grandmother let the child go outside to him. As he was standing on the porch holding the child, Sanita, her aunt, and her brother ran out of the house toward him. Sanita struck him repeatedly in the face, and the aunt took the child from his arms and went inside. The defendant returned to Young's car, called the police, and then waited for them to arrive. He spoke with the police and had Young speak with them about what had happened. He later learned that an arrest warrant had been issued

against him so he turned himself in.

{¶14} Defendant's twin sister testified that the defendant broke up with Sanita because she hit him.

{¶15} On January 16, 2014, the defendant was acquitted of the charge of domestic violence pertaining to his child, convicted of domestic violence upon Sanita, and was also convicted of child endangering. The defendant was found not guilty of domestic violence as to the child. The trial court sentenced the defendant to 180 days of incarceration with 170 days suspended, credit for two days served, and permission to complete the jail term during consecutive weekends. The court also imposed a fine of $1,000, with $750 suspended, and ordered the defendant to complete one year of postrelease control sanctions.

{¶16} Defendant now appeals, assigning the following error for our review:

> The judgment of the jury in the appellant's trial finding him guilty of domestic violence and child endangerment was the result of the ineffective assistance of his counsel.

{¶17} The defendant raises three assertions in support of this assignment of error. First, he asserts that his trial attorney failed to properly investigate the matter. In support of this claim, the defendant complains that his counsel did not take photographs, did not thoroughly interview a defense witness who provided damaging testimony about defendant's temper, and did not properly cross-examine Sanita. Secondly, defendant argues that his trial counsel failed to object to testimony from witnesses stating that the defendant frequently causes a "ruckus," screams, and engages in erratic behavior during visitations. Thirdly, the defendant complains that his trial counsel failed to object to the prosecuting attorney's disparaging statements during closing argument.

{¶18} In order to prevail on a claim of ineffective assistance of counsel, a defendant must

show that counsel's performance fell below an objective standard of reasonableness and that prejudice arose from counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel's representation fell below an objective standard of reasonableness. *Strickland*. The reviewing court must presume that counsel's conduct was competent, and without the distorting effects of hindsight and reviewing courts, should refrain from second-guessing tactical decisions of trial counsel. *Id.* at 689. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable. *Id.* at 687.

{¶19} With regard to counsel's duty to investigate, the *Strickland* court stated:

In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.* at 691.

{¶20} In this matter, defendant complains about the extent of his trial counsel's investigation since defense witness Young stated, on cross-examination, that the defendant has difficulty controlling his temper. The record indicates, however, that Young was an eyewitness to the events at issue, and she did not observe the defendant "do anything wrong." It is therefore entirely reasonable and predictable that counsel would call her to testify in this matter.

{¶21} The defendant additionally complains that his trial counsel was ineffective for failing to present photographs and diagrams of the porch area to the jury in order to demonstrate the unlikeliness of the city's version of events. The strategy employed by defendant's trial counsel was to depict Sanita as the aggressor in the parties' contentious relationship and to suggest that her claims were entirely fabricated or that the child was scratched when Sanita's aunt suddenly grabbed her from defendant's arms. We will not second-guess this tactical decision through hindsight. Moreover, to the extent that the defendant introduces new evidence for the first time on appeal, including transcripts from civil proceedings concerning this incident, we note that this evidence is outside of our trial court record, and therefore, it cannot be considered herein. *State v. Hartman*, 93 Ohio St.3d 274, 299, 2001-Ohio-1580, 754 N.E.2d 1150; *State v. Carter*, 89 Ohio St.3d 593, 606, 2000-Ohio-172, 734 N.E.2d 345.

**{¶22}** As to defendant's additional contention that his trial counsel failed to object to Sanita's testimony that defendant is "always disrespectful, always yelling, threatening, screaming, hollering," we conclude that the trial court could have properly determined that this evidence was admissible to establish the defendant's intent, and the absence of mistake. *Lakewood v. Bretzfelder*, 8th Dist. Cuyahoga No. 98925, 2013-Ohio-4477, ¶ 25. In any event, it is unlikely that, but for the admission of this evidence, the outcome of the defendant's trial would have been different. Therefore, we cannot conclude that counsel committed a prejudicial error in failing to object to this evidence. *Accord State v. Banks*, 5th Dist. Fairfield No. 10 CA 36, 2011-Ohio-3801, ¶ 160.

**{¶23}** As to counsel's failure to object to the prosecuting attorney's comments that defendant was "manipulative, nasty" and a "bully," we note that when a defense attorney fails to object to a prosecutor's repeated "pejorative ranting at his client's expense," such performance falls below an objective standard of reasonable representation. *State v. Carpenter*, 116 Ohio App.3d 615, 626, 688 N.E.2d 1090 (2d Dist.1996). Nonetheless, where the comments properly relate to what the evidence has shown and the reasonable inferences presented from the evidence, defense counsel is not ineffective in failing to object. *State v. Semer*, 6th Dist. Fulton No. F-11-005, 2011-Ohio-6502, ¶ 25. We have carefully reviewed the closing argument and it is clear that the challenged statements plainly indicate that the prosecutor was summarizing the testimony of Sanita and the grandmother. The comments directly relate to the trial testimony, and are not the prosecutor's own ad hominem attacks upon defendant. As such, the statements are not improper so counsel was not ineffective for failing to object to them. In any event, the trial court instructed the jury that counsel's opening and closing statements are not evidence so we cannot say that they were prejudicial.

**{¶24}** In accordance with all of the foregoing, the assignment of error is without merit.

**{¶25}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cleveland Municipal Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
MELODY J. STEWART, J., CONCUR