[Cite as *State v. Hubal*, 2025-Ohio-2320.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT


|  |  |  |
|---|---|---|
| | : | JUDGES: |
| | : | Hon. Craig Baldwin, P.J. |
| STATE OF OHIO | : | Hon. Michael D. Hess, V.J. |
| | : | Hon. Jason Smith, V.J. |
| Plaintiff-Appellant | : | |
| | : | Judge Hess and Judge Smith |
| -vs- | : | Sitting by Assignment of the |
| | : | Supreme Court of Ohio |
| | : | |
| TIMOTHY A. HUBAL, JR. | : | Case No.  2024 CAA 070041 |
| | : | |
| Defendant-Appellee | : | O P I N I O N |


CHARACTER OF PROCEEDINGS:     Appeal from the Delaware County Court
of Common Pleas,
Case No. 2011 CRI 10 0536


JUDGMENT:     Reversed


DATE OF JUDGMENT ENTRY:     June 30, 2025


APPEARANCES:

For Plaintiff-Appellant

MELISSA A. SCHIFFEL
Prosecuting Attorney, Delaware County, Ohio
KATHERYN L. MUNGER
Assistant Prosecuting Attorney,
Delaware County Prosecutor's Office
145 North Union Street, 3rd Floor
Delaware, Ohio  43015

For Defendant-Appellee

SPENCER CAHOON
Law Office of Spencer J. Cahoon
800 S. Cassingham Rd.
Bexley, Ohio  43209

*Hess, J.*

**{¶1}** Plaintiff-Appellant State of Ohio appeals the June 25, 2024 judgment entry of the Delaware County Common Pleas Court granting Defendant-Appellee's motion to withdraw his guilty plea. Defendant-Appellee is Timothy A. Hubal, Jr.

## I. STATEMENT OF THE FACTS AND CASE[1]

**{¶2}** In March 2011, a Delaware County grand jury indicted Hubal on multiple counts of rape, unlawful sexual contact with a minor, and gross sexual imposition. The charges involved two minors. In October 2011, Hubal was indicted on additional rape and gross sexual imposition counts, as well as one count each of felonious assault and domestic violence. These charges arose from incidents involving a third minor, Hubal's stepdaughter.

**{¶3}** In November 2011, Hubal entered *Alford* pleas[2] to one count of unlawful sexual contact involving the first minor, one count of gross sexual imposition involving the second minor, and one count of rape involving the third minor, his stepdaughter. The remaining twenty charges were dismissed. The trial court sentenced Hubal to a jointly recommended sentence of an aggregate term of life imprisonment with parole eligibility after 25 years.

**{¶4}** In 2012, Hubal filed a motion for leave to file a delayed appeal that was denied. In July 2023, Hubal filed a motion to vacate his conviction and to withdraw his *Alford* plea. Hubal argued that his plea was induced by his trial counsel's false

---

[1] The procedural history is summarized from *State v Hubal,* 2023-Ohio-4100, ¶ 2-6 (5th Dist.).

[2] An *Alford* plea is a guilty plea that is entered despite contentions of innocence. It may be accepted where the validity of the plea cannot seriously be questioned in view of a strong factual basis for the plea that is demonstrated by the record. 26 Ohio Jur. 3d, Criminal Law: Procedure, § 991 (Feb. 2025 Update); *North Carolina v. Alford*, 400 U.S. 25, 38 (1970).

representations and failure to properly investigate the evidence prior to advising him to make the *Alford* plea. Among other things, Hubal attached an affidavit made in 2023 and deposition from his stepdaughter taken in 2022, who was then 20 years old, in which she "claimed she was coached by her mother to make false allegations against her stepfather Hubal and he never committed the offense she accused him of." *State v. Hubal,* 2023-Ohio-4100, ¶ 6 (5th Dist.). She had made the original accusations against Hubal when she was seven years old. The trial court denied the motion, Hubal appealed, and we affirmed the trial court's judgment. *Id.* at ¶ 40.

**{¶5}** In March 2024, Hubal filed a second motion to withdraw his *Alford* plea. He contended that his stepdaughter, who is now an adult, has come forward with statements that she was coerced by her mother to make false accusations against Hubal. He argued that because the only evidence in the case was her prior statements made in 2011 when she was seven, her recantation calls into question the entire basis of his conviction. He also argued that his motion should not be barred by res judicata because it raises different claims that were not adjudicated in the first motion to withdraw the *Alford* plea. Specifically, his first motion was couched in terms of (1) an ineffective assistance of counsel claim based on his trial counsel's failure in 2011 to interview his stepdaughter separately and discover the coercive and false nature of her statements and (2) a *Brady* violation[3] that the prosecutor knew of the coercion and withheld that information from the defense. Both claims were based on alleged failures that occurred in 2011. His second

---

[3] A *Brady* violation occurs when the prosecution suppresses evidence favorable to an accused, upon request, where the suppressed evidence is material either to the defendant's guilt, or to punishment of the defendant upon a guilty verdict. 25 Ohio Jur. 3d, Criminal Law: Procedure, § 376 (Feb. 2025 Update); *Brady v. Maryland,* 373 U.S. 83 (1963).

motion was focused on events that occurred beginning in 2021, after his stepdaughter turned 18 and culminated in her recantation of the rape allegations in her deposition in 2022.

{¶6} The State opposed Hubal's motion on the ground that it was barred by res judicata. The State argued that, in his prior motion to withdraw his guilty plea, Hubal contended that his stepdaughter's accusations were coached and coerced by her mother and that his counsel was deficient for failing to make a full investigation of the accusations before advising him to make an *Alford* plea. This motion was denied and affirmed on appeal. Thus, the State argued Hubal cannot make a second attempt to withdraw his plea based on the same underlying facts. The State also argued that Hubal failed to establish a reasonable likelihood that a withdrawal of his plea is necessary to correct a manifest injustice and a witness's recantation is an insufficient basis to withdraw a plea.

{¶7} The trial court held a 2-day hearing on the motion at which Hubal, his stepdaughter, her mother, Hubal's mother, and Hubal's 17-year-old son testified. The stepdaughter testified that Hubal never sexually assaulted her and that the only reason she made that allegation in 2011 was because her "mother used to coach me beforehand and try to put in my brain that it was my stepfather doing all those things to me instead of the men she brought in." When the issue first came up, the stepdaughter was in foster care and then in the custody of her grandparents. Stepdaughter testified that her mother began coaching her after her arm was broken in October 2010, she had not shown up for school for a long time, and the school had notified children services. Stepdaughter explained that instead of her stepfather, it was other men that her mother brought home who sexually assaulted her. However, her mother told her to say it was Hubal who did it

because she wanted out of the relationship with him. Stepdaughter testified that she did not have a close relationship with her mother and that she listened to her coaching and coercion because she thought it would bring her mother closer to her.

{¶8} Stepdaughter testified that her mother never regained custody of her and she was in the care of her paternal grandparents until age 15 when she went to the Belmont Institute for psychiatric treatment. After staying a year at the Belmont Institute, stepdaughter went into foster care until she turned 18 years old. She testified that after she went to live with her foster care parents, she started to mature and got straight A's in school. Stepdaughter testified that after the 2011 court proceedings, she did not discuss the case with anyone and no one raised it with her. After stepdaughter became older, she reached out to Hubal's mother to try to locate her younger half-brother, C.H., with whom she had no contact since she was a child. During her discussions with Hubal's mother, stepdaughter became introduced to Hubal's girlfriend, Jessica Barnhart, who helped stepdaughter obtain public records and documents about the case. Stepdaughter testified that her memory of the events did not match up to what she was finding in the records.

{¶9} Jessica Barnhart told stepdaughter about the "Wrongful Conviction Project" and stepdaughter began talking to Hubal and working with Hubal's attorney. Stepdaughter lived with Jessica Barnhart "for a while after I tracked down my mother and she wasn't the woman I thought she was." Stepdaughter testified that after she left foster care, she lived with several different men she was romantically involved with and then tracked down her mother and moved in with her. Stepdaughter testified that her mother never wanted to discuss the case with her because when she brought it up, her mother

"would shut me down or change the subject." She and her mother had a falling out and Jessica Barnhart drove up to get her and gave her a place to stay for a little over a year in 2022. Jessica provided her transportation everywhere and she started working with Hubal's attorney after she moved in with Jessica.

{¶10} Stepdaughter testified that neither Jessica, Hubal's mother, nor Hubal brought up the idea to write a statement supporting Hubal's innocence, "I actually was the one that brought that up." She explained that none of the family members put any pressure on her to make a statement or to testify. Stepdaughter testified that she first initiated the conversation with Hubal's mother when they went to a restaurant to meet with C.H. Stepdaughter told Hubal's mother that "I felt a lot of what I remembered wasn't accurate."

{¶11} Stepdaughter testified that she was motivated to recant her prior accusations out of a sense of obligation to herself and because "someone who is innocent shouldn't be in prison." Stepdaughter testified that her mother was an untruthful person and cheated on her husbands "quite a lot."

{¶12} On cross-examination, the State established that stepdaughter suffered a broken arm in October 2010 and was removed from her mother and Hubal's custody in February 2011. Stepdaughter reviewed the medical report from June 2011, which documented stepdaughter's medical forensic interview during which she accused Hubal of rape. Stepdaughter admitted that even though she claimed that her mother coached her about the false accusation back in October 2010, she did not bring it to anyone's attention until June 2011, after she had been out of her mother's care and custody for five months. Stepdaughter admitted that her information about her mother cheating on various

husbands came from statements those husbands subsequently made to stepdaughter, "from what they had dealt with." But stepdaughter also testified, "Now I only know this because I remember my mom bringing men into the house to fuck them while [Hubal] was at work."

{¶13} Stepdaughter testified that she obtained case-specific information from Jessica Barnhart and from Hubal's attorney. Stepdaughter refers to Jessica Barnhart as her "stepmom" and "like a best friend to me" and she refers to Hubal as her father because "he was more of a father than my own father." Stepdaughter was in between homes and had no place to stay when she moved in with Jessica.

{¶14} Stepdaughter spoke to an investigator with the Delaware County Prosecutor's office in January 2023, after the September 2022 deposition, and told him that the first contact she had with any of Hubal's family was when Hubal's father reached out to her on Facebook, but she now contends that her first contact was when she reached out to Hubal's mother. Stepdaughter conceded that "I don't remember the exact timeline . . . of who I was talking to first." Stepdaughter admitted that when she spoke to the investigator, she told him that it was her grandparents, not her mother, that had been constantly coaching her about the false accusations. However, about half-way through the interview, she remembered it differently and told the investigator that it was actually her mother who coached her to make false accusations. She also told the investigator that Hubal was trying anything he could to get out of prison.

{¶15} Stepdaughter testified that Jessica Barnhart and Hubal were talking on the phone two to three times a day, often in her presence and she would occasionally join in

on the call. On her way to the 2022 deposition to recant her accusations she was on a joint telephone call with Jessica and Hubal.

**{¶16}** A break was taken during cross-examination so that stepdaughter could review the videotape of the 2011 interview of her when she reported the accusations to medical personnel. Stepdaughter acknowledged that in the videotaped interview, she did not state that her mother had told her to make the accusations and that she had told the interviewer that "mean daddy Tim" did it.

**{¶17}** Hubal testified that he was innocent of the crime of rape against his stepdaughter. Hubal testified that he met his current girlfriend, Jessica Barnhart, while he was in prison serving time on multiple sexual assault charges. Hubal testified that after the children were removed from his and his wife's custody in 2011, only his wife (stepdaughter's mother) had visitation rights and those were only supervised visitation so that someone else was present while she was visiting the children.

**{¶18}** Stepdaughter's mother testified that her daughter came to live with her after she left foster care. Her daughter did not live with her for an entire year because mother asked her if she would get a job and follow the house rules. As a result, daughter decided to move out.  Mother testified that after her daughter and the other children were removed from their custody, she continued to reside with Hubal. She had visitation with the children, but it was supervised visitation and her actions and words were monitored both visually and audibly.  Mother testified that she never coached her daughter what to say or told her to lie about Hubal. Mother testified that when daughter came to live with her, she spoke with mother about how much she hated Hubal. Mother was unaware that

daughter alleged that mother allowed men to rape her when mother was the only adult present in the home.

**{¶19}** Hubal's mother testified that she has had a strained relationship with Hubal since he has been imprisoned. Hubal's mother has raised Hubal's son, C.H., since he was 5 years old and he is now 17 years old. Hubal's mother testified that she reconnected with stepdaughter in 2021 after stepdaughter reached out about connecting with them and her half-brother, C.H. Hubal's mother testified that stepdaughter eventually told her that "she remembers Tim doing nothing to her, that it was all put in her head over time." Hubal's mother testified that, in her opinion, Hubal's ex-wife was a liar. Hubal's mother testified that she never believed that her son had done any of the things for which he had been convicted.

**{¶20}** Hubal's son, C.H. (stepdaughter's half-brother), testified that he reconnected with his half-sister in 2021. He testified that when he was a small child, Hubal was working a lot and their mother was home with them and would starve them and use food as bribery. He testified that he did not believe that his mother could be trusted and "is probably the most evilest being I know on this planet." He also testified that his mother told him to say that she did nothing wrong and that Hubal had done something wrong.

**{¶21}** The trial court granted Hubal's motion to withdraw his guilty plea. First, the trial court determined that res judicata does not bar Hubal's second motion to withdraw his *Alford* plea. The trial court found that the first motion was brought by Hubal, pro se, under R.C. 2953.21 (Ohio's postconviction statute) and presented an ineffective assistance of counsel claim under Crim.R. 32.1. The trial court acknowledged that this motion was denied as untimely and the motion to withdraw his plea was "oddly framed"

because there was no evidence of any deficient performance on the part of his trial counsel in 2011. The trial counsel was properly relying upon the recorded statements stepdaughter made in 2011. The trial court acknowledged that its reasoning was affirmed on appeal, citing *State v. Hubal*, 2023-Ohio-4100, ¶ 36 (5th Dist.).

**{¶22}** In contrast, the trial court found the current motion offers a different rationale.

> Rather than pointing to alleged deficiencies on the part of his 2011 lawyer, he now contends that new facts – the current memories voiced by a now-adult [stepdaughter] – have cast doubt on the information that both he and the State had in hand at the time of the 2011 *Alford* plea. The current motion, in other words, focuses not on the work of the lawyers for either side 13 years ago but instead on what appears to be a markedly different set of facts that no one in 2011 could have anticipated.

Judgement Entry, p. 6.

**{¶23}** The trial court acknowledged that res judicata has been applied to bar repeated motions under Crim.R. 32.1 but that a court is not to apply the doctrine " 'so strictly as to deprive a party of justice.' " Judgment Entry, p. 6., quoting *Boyd v. Boyd*, 2022-Ohio-4775, ¶ 24 (10th Dist.). The trial court determined that it would not deprive Hubal of an opportunity to present the merits of his claim "simply because he raised – in last year's pro se Criminal Rule 32.1 motion – an inartful and wide-of-the-mark ineffective-assistance claim. His argument now is a different one, and . . . application of that doctrine now would work an injustice." *Id.* at p. 7.

**{¶24}** Turning to the merits of the motion, the trial court found that Hubal had met his burden of showing a manifest injustice has occurred. The injustice was not a result of any wrongdoing in the 2011 plea hearing, but as a result of new information from the now-adult stepdaughter, which left the trial court "with grave doubts about the defendant's

guilt." *Id.* The trial court also noted that Hubal has always maintained his innocence to the rape charge via his 2011 *Alford* plea and his testimony at the 2024 hearing. The trial court acknowledged that stepdaughter's credibility should be viewed with suspicion because she has become "quite friendly" with Hubal's girlfriend, Jessica Barnhart, who has provided stepdaughter with financial assistance and a place to stay. Additionally, Jessica Barnhart's and Hubal's mother's interactions with stepdaughter have "likely reinforced [stepdaughter's] shift to a similar belief." Her statements as a seven-year-old were made when her mother was no longer able to coach or coerce her, but her testimony at the hearing came after several years of association with and influence by Hubal's girlfriend and his mother. Ultimately the trial court found the adult stepdaughter's present day sworn testimony to be credible. The trial court noted there were no evaluations from mental health professionals in 2011 about the reliability of her memory or her ability to perceive events accurately to assist the court in evaluating the credibility of her 2011 unsworn statements.

**{¶25}** The trial court granted Hubal's motion to withdraw his *Alford* plea, vacated the November 2011 judgment of conviction, and vacated the judgment entry dismissing the remaining counts in the indictment.

**{¶26}** It is from the June 25, 2024 judgment of the trial court that the State files its appeal, assigning as error:

I.  THE TRIAL COURT ERRED IN ALLOWING THE WITHDRAWAL OF PLEA HEARING DUE TO RES JUDICATA.

II.  THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE MOTION TO WITHDRAW PLEA.

## II. LEGAL ANALYSIS

### A. Res Judicata

**{¶27}** The State argues that the trial court erred in failing to apply the doctrine of res judicata to Hubal's motion. Because Hubal had already brought a motion to withdraw his plea, this second motion requesting the same relief should be barred. Any additional grounds that he may have had to support the motion had to be raised then or be barred – he cannot "piecemeal" his claims and spread them out over several motions and over the course of several years.

**{¶28}** Hubal argues that the doctrine of res judicata is not to be applied rigidly or in cases where to do so would work an injustice. He argues that the trial court has discretion not to apply res judicata when to do so defeats the ends of justice. Hubal contends that he filed his first motion to withdraw pro se and did not raise the same issues that are raised in the second motion.

### 1. Standard of Review

**{¶29}** We apply a de novo review of the trial court's decision not to apply the doctrine of res judicata to Hubal's motion to withdraw his plea:

> The doctrine of res judicata is applicable to successive motions to withdraw a guilty plea under Crim.R. 32.1. "Res judicata applies to bar raising piecemeal claims in successive postconviction relief petitions or motions to withdraw a guilty plea that could have been raised, but were not, in the first postconviction relief petition or motion to withdraw a guilty plea." The applicability of res judicata is a question of law, which an appellate court reviews de novo.

(Citations omitted.) *State v. Tinney*, 2012-Ohio-72, ¶ 27 (5th Dist.).

## 2. Legal Analysis

{¶30} The trial court determined that Hubal's first pro se untimely motion for postconviction relief under R.C. 2953.21, which included an ineffective assistance of counsel claim under Crim.R. 32.1 should not bar him from seeking to withdraw his *Alford* plea. The trial court found Hubal's first motion an "oddly framed request to withdraw the plea" that was "inartful and wide-of-the-mark." Hubal's rationale focused on the 2011 period and claimed that had his trial counsel properly investigated his stepdaughter's statements back then, his trial counsel would have discovered the alleged manipulation, coercion, and coaching by her mother. In contrast, Hubal's current motion argued that new facts "the current memories voiced by the now-adult [stepdaughter]" place his *Alford* plea in question.

> The current motion, in other words, focuses not on the work of the lawyers for either side 13 years ago but instead of what appears to be a markedly different set of facts that no one in 2011 could have anticipated.

{¶31} The trial court acknowledged that res judicata has been applied to bar successive motions under Crim.R. 32.1. However, the trial court also acknowledged that the doctrine "ought not be applied so rigidly as to result in an unjust outcome." The trial court cited *State v. Grillo*, 2015-Ohio-308, ¶ 20 (5th Dist.) to support its finding that it would not serve justice and fairness to bar Hubal's second motion. *Grillo* involved successive motions to seal/expunge a record, a number that were filed before a statutory amendment, and one filed after a statutory amendment that changed the definition of "eligible offender." Quoting the Supreme Court of Ohio, *Grillo* found:

> Res judicata is a rule of fundamental and substantial justice that " 'is to be applied in particular situations as fairness and justice require, and that * * * is not to be applied so rigidly as to defeat the ends of justice or so as to work an injustice.' " [Citations omitted]

> *State v. Simpkins,* 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d 568, ¶ 25, *superseded by statute on other grounds as stated in State v. Singleton,* 124 Ohio St.3d 173, 2009-Ohio-6434, 920 N.E.2d 958.

*State v. Grillo*, 2015-Ohio-308, ¶ 20 (5th Dist.). Therefore, even though res judicata may be applied to Hubal's claim, the trial court is not required to apply it where it would work an injustice. The trial court found that the "compelling new facts" that the now adult stepdaughter testified she fabricated the accusations against Hubal when she was seven years old because of coercion from her mother, prompted the court to agree that res judicata should not apply to bar his new motion.

**{¶32}** We disagree. Although we agree that res judicata should not be applied where it would work an injustice, we find no injustice in applying res judicata to Hubal's second motion. Res judicata applies to bar Hubal's second motion because the "compelling new facts" he raised in his second motion were known to Hubal when he filed his first motion – he had his stepdaughter's recantation when he filed it and discussed the recantation in his first motion. She recanted her accusations in September 2022 and Hubal's first motion was filed in July 2023. We agree that his first motion was inartful and missed the mark. However, he could have and should have made the arguments he makes now, in his first motion.[4]

**{¶33}** Moreover, we find no injustice in applying res judicata to this case. Nothing prevented Hubal from fully briefing the legal issues related to the recantation in his first

---

[4] In his brief, Hubal contends that the attorney he was working with when he learned of stepdaughter's recantation was disbarred in January 2023, leaving Hubal to act pro se when he filed his first motion in July 2023. *See In re Resignation of Stone*, 2023-Ohio-129. We can find no place in the record that Hubal presented this fact to the trial court or that the trial court considered it in rendering its decision. *State v. Howard*, 2024-Ohio-2410, ¶ 28 (5th Dist.) (appellate court cannot consider matters outside the trial court record).

motion. This is not a situation where Hubal filed his first motion *before* his stepdaughter recanted her accusations and his second motion *after* her recantation. However, even if that were the situation, a recantation is viewed with extreme suspicion and does not bar the application of res judicata in most instances. *State v. Little*, 2022-Ohio-1295, ¶ 16 (10th Dist.) ("recanting affidavits and witnesses are viewed with extreme suspicion"). And this case is readily distinguishable from *State v. Grillo, supra,* because there was no statutory amendment or other change in the legal authority governing his conviction that would give rise to new claims that would not have been available to him when he filed his first motion. Rather, Hubal had the legal basis and facts in July 2023 when he filed his first motion but neglected to raise all his purported claims. Any "injustice" that Hubal suffers is of his own making.

{¶34} We find that the trial court erred as a matter of law when it failed to find that Hubal's claims were barred by res judicata and we sustain the State's first assignment of error. Because we sustain the State's first assignment of error and find that Hubal's motion was barred by res judicata, the State's second assignment of error is moot and we dismiss it.

### III. CONCLUSION

{¶35} For the foregoing reasons, we sustain appellant's first assignment of error, dismiss as moot the second assignment of error, and reverse the decision of the Delaware County Court of Common Pleas.

.

By: Hess, V.J.
Baldwin, P.J.
Smith, V.J., concur

_____
HON. MICHAEL D. HESS, V.J.
Sitting by assignment for the
Supreme Court of Ohio


_____
HON. CRAIG BALDWIN, P.J.


_____
HON. JASON P. SMITH, V.J.
Sitting by assignment for the
 Supreme Court of Ohio

IN THE COURT OF APPEALS FOR DELAWARE COUNTY, OHIO

FIFTH APPELLATE DISTRICT


STATE OF OHIO                     :

        :

    Plaintiff-Appellant         :

        :

-vs-                          :        JUDGMENT ENTRY

        :

TIMOTHY A. HUBAL, JR.,      :

        :

    Defendant-Appellee      :        Case No.  2024 CAA 07 0041


For the reasons stated in our accompanying Opinion, the judgment of the

Delaware County Court of Common Pleas is reversed.  Cost assessed to appellee.


_____

HON. MICHAEL D. HESS, V.J.
Sitting by assignment for the
Supreme Court of Ohio


_____

HON. CRAIG BALDWIN, P.J.


_____

HON. JASON P. SMITH, V.J.
Sitting by assignment for the
Supreme Court of Ohio